IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PIZZA INN, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:18-CV-0221-N |
| | § | |
| BOB CLAIRDAY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Pizza Inn, Inc.'s ("Pizza Inn") Rule 50 Motion for Judgment as a Matter of Law [63], as well as constituting the Court's findings of fact and conclusions of law on the issue of equitable intervention.[1]

Pizza Inn and Defendant Clairday entered into two Area Development Agreements. *See* Exs. 1, 2. Under the terms of those agreements, Clairday paid Pizza Inn $1,250,000. In exchange, Pizza Inn made Clairday an "area developer," giving Clairday the right to recruit and develop Pizza Inn franchisees within a specified geographic area. Clairday also had certain obligations to oversee the franchises in the area, such as providing training and management. The geographic area included Arkansas, the southern third of Missouri, and a few counties in Oklahoma and Texas. Clairday also had some of his own Pizza Inn

---

[1]This case was primarily tried to a jury, which returned a verdict in favor of Clairday. The parties agreed that the issue of equitable intervention should be tried to the Court, based on the trial record before the jury and any supplemental evidence presented to the Court only. Neither party has requested to provide additional evidence to the Court, so it decides this issue based on the record developed before the jury.

ORDER – PAGE 1

franchises in Arkansas and developed more. In exchange for growing the brand within the development area, Clairday received half of the royalty payments from the franchises in the area, including his own.[2]

The original duration of the agreements was twenty years, from December 2, 1992 to December 1, 2012. The agreements also provided for two five year extensions at Clairday's option. "If Area Developer desires to exercise its renewal option, Area Developer shall deliver written notice of its intention to renew to Company not less than six months prior to the expiration of the current term of this Agreement." *See* Ex. 1, ¶ 3. While Clairday timely exercised the first five year renewal option, he was two months late giving notice for the second five year renewal. The issue is whether the Texas doctrine of equitable intervention excuses the delay in giving notice.[3]

The Texas Supreme Court adopted the doctrine of equitable intervention in *Jones v. Gibbs*, 130 S.W.2d 265 (Tex. 1939).[4] Jones granted Gibbs Brothers & Company ("Gibbs") the right to harvest standing timber off her land for ten years, with five one-year extension

---

[2]The evidence showed that at the time, Pizza Inn was under some financial distress and that this structure both gave Pizza Inn immediate cash and provided for growth of the brand primarily at the area developer's expense, and not on Pizza Inn's nickel.

[3]The Court has previously ruled in response to Pizza Inn's motion for summary judgment that the doctrine can legally be applied to agreements like the Area Development Agreements, but did not decide whether it should be invoked on these facts. *See* Order at 7-8 [48].

[4]The opinion was by the Texas Commission of Appeals and adopted by the Texas Supreme Court, and therefore is treated as an opinion by the Texas Supreme Court. *See* THE GREENBOOK: TEXAS RULES OF FORM 5.2.2 (13th ed. 2014).

options for an additional fee. By the end of the original term of the timber lease, Jones had died and her husband was appointed executor of her estate. He instructed Gibbs in writing to pay the first extension fee to Wynne, the only creditor of the estate, and Gibbs did so. Pursuant to verbal instructions from the executor, Gibbs also paid the second extension fee to Wynne, but the executor declined to accept that and took the position that the timber lease had expired.

The Texas court quoted with approval *F.B. Fountain Co. v. Stein*, 118 A. 47, 50 (Conn. 1922): "In cases of mere neglect in fulfilling a condition precedent of a lease, which do not fall within accident or mistake, equity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease." 130 S.W.2d at 272. Later courts have understood this to be the three-part test for equitable intervention announced in *Jones*. *See, e.g., Valley Educ. Foundation, Inc. v. ElderCare Props. Ltd. (In re ElderCare Props. Ltd.)*, 568 F.3d 506, 520-22 (5th Cir. 2009) (collecting cases).

The Court will now consider the *Jones* three-part test.

First, the Court finds the delay in notice was slight. *ElderCare* is instructive. The lease at issue had an original ten year term expiring December 31, 2006. ElderCare could renew the lease for an additional five year term if it gave written notice not later than thirty days prior to the expiration. 568 F.3d at 510. In the midst of other disputes and litigation, ElderCare failed to timely give notice. On January 3, 2007, the landlord notified ElderCare

that the lease was terminated, *id.* at 513; ElderCare gave notice of renewal the following day, *id.* at 514. The Fifth Circuit affirmed the Bankruptcy Court's finding that the delay was slight:

> ElderCare's delay in exercising its option was relatively slight. It provided written notice approximately one month late, one day after it was informed of its negligent omission. We consider this a relatively minor delay when compared to the lease's original ten-year term and its five-year renewal term.

*Id.* at 521.

Clairday has an even stronger argument that the delay was slight. First, while Clairday's renewal term was also five years, the agreement had been in place for twenty-five years, rather than *ElderCare*'s ten years. Second, like in *ElderCare,* Clairday also gave notice immediately when his failure to give notice was called to his attention.[5] Third, while the notice requirement in *ElderCare* was 30 days before termination, Clairday's notice requirement was six months before termination. Thus, while Clairday's notice was two months late, in contrast to *ElderCare*'s one month delay, Clairday actually gave notice four months *before* the agreement terminated, rather than three days *after* the lease terminated in *ElderCare*. The Court finds that Clairday's delay in exercising its option was relatively slight and this factor weighs in favor of equitable intervention.

Next, the Court finds that the loss to Pizza Inn from the delay is slight. As an initial matter, Pizza Inn appears to think the pertinent loss is the loss from performing the contract for the renewal term. *See* Plaintiff's Rule 50 Motion at 4 [63]. The Court disagrees. First,

---

[5]Also as in *ElderCare*, Clairday and Pizza Inn were in the midst of other disputes.

if Pizza Inn were correct, this factor would always weigh against equitable intervention: if a party were going to make money from a renewal, it would simply renew the contract and the issue would not be before a court. Second, the economics of the transaction were determined by the deal the parties struck; a delay in giving notice should not be an opportunity to retrade the deal on more favorable terms. Third, Pizza Inn's argument would result in a double-counting with the third factor. The loss to Clairday from terminating the agreement is simply the flip side of the loss to Pizza Inn from performing under the extension.[6] Accordingly, the Court holds that the correct measure is the loss, if any, *caused by the delay in notice*.

Here Pizza Inn can show no loss caused by the delay. The notice came four months before the renewal date, giving Pizza Inn ample time to consider the renewal. Pizza Inn did not incur any out of pocket expenses or costs of cover in trying to find a replacement area director. Pizza Inn simply decided to let Clairday's Area Development Agreements expire

---

[6]This reading is consistent with courts' analysis of untimely motions for leave to amend pleadings. Under *S&W Enters., L.L.C. v. South Trust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003), one of the four factors to consider is prejudice to the opposing party. But courts assessing that factor do not consider prejudice from the amendment itself, but rather prejudice from the untimeliness of the motion. *See, e.g.*, *Squyres v. Heico Cos.*, 782 F.3d 224, 238-38 (5th Cir. 2015) (finding prejudice where discovery would have to be reopened and opposing party had already filed motion for summary judgment so deadline for dispositive motions would have to be reopened); *Grant v. City of Houston*, 625 F. App'x 670, 679-80 (5th Cir. 2015) (finding prejudice where defendant had already filed motion for summary judgment and district court would have to consider another round of dispositive motions); *Narvaez v. Wilshire Credit Corp.*, 2010 WL 5452115, at *2-3 (N.D. Tex. 2010) (Lynn, J.) (denying untimely motion for leave to amend complaint where summary judgment motion was filed and briefed, need for further discovery was possible, and granting motion would likely require new deadlines for dispositive motions and discovery even if court continued the trial date).

without any replacement area developer. Pizza Inn had no loss caused by the delay, so the Court finds that this factor weighs in favor of equitable intervention.

Finally, the harm to Clairday from termination was significant. It essentially resulted in a forfeiture of five years of benefits under the Area Development Agreements for which Clairday had essentially already paid. "[I]t is well-settled that 'equity abhors forfeiture.'" *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.2d 419, 429 (Tex. 2008) (quoting *Jones v. N.Y. Guar. & Indem. Co.*, 101 U.S. 622, 628 (1879) ("A court of equity abhors forfeitures, and will not lend its aid to enforce them.")). Clairday had already paid his $1,250,000 for the Area Development Agreements, he had already identified and grown subfranchisees, he had already trained and managed; the only thing remaining for him to do was to continue his management and supervision obligations and to develop new franchises. Consequently, according to the jury verdict, he forfeited $250,000.[7] The Court finds this hardship makes it unconscionable to enforce literally the six month notice provision, and that this factor weighs in favor of equitable intervention.

Because all three factors of the equitable intervention test support intervention, the Court finds that Clairday's notice was sufficiently timely and that Pizza Inn could not refuse the second five year extension of the Area Development Agreements on the basis of late notice. For essentially the same reasons, the Court denies Pizza Inn's motion for judgment as a matter of law on this issue.

---

[7]Clairday also offered evidence that the loss of the Agreements would have a devastating effect on Clairday's remaining business, which included the employment of his wife and two sons.

Pizza Inn also moved orally at the appropriate time for judgment as a matter of law on Clairday's breach of contract claim on the basis that Clairday had not proved his lost profits damages with reasonable certainty. The Court denied that motion from the bench, but that ruling merits a few words of explanation.

Clairday's damage testimony came primarily from his accountant, Mr. Knight. The evidence showed that Clairday reported his income from the Agreements for tax purposes through an entity called BCI Pizza Development, Inc. ("BCI"). Knight testified that based on BCI's previous five years' figures, Clairday earned average net income of about $174,000 per year from the agreements. *See* Ex. 30. Based on that, Knight testified that Clairday's lost profits due to the nonrenewal were $787,511.82, discounted to present value. *See* Ex. 31. On cross, Pizza Inn showed that for some years before Knight's five year period, BCI incurred certain significant expense items that it did not report (or that were reduced) during Knight's five year period.

There was no evidence in the record to show what happened to those expenses. They may have been allocated properly to another Clairday entity, they may have been reduced. There certainly was no evidence that BCI's accounting records had been altered for purposes of trial; it seem implausible that Clairday would have presciently foreseen Pizza Inn's December 2017 breach and started cooking BCI's books in October 2012 to jack up his damages proof.

Wright testified that his number was correct. Pizza Inn developed certain criticisms of Wright's analysis in cross. Pizza Inn's cross of Wright was not so definitive as to require

the jury, as a matter of law, to decide that Clairday had not proved his lost profits with reasonable certainty. The jury was within its right as fact finder to mediate those positions, *and it did*: based on Pizza Inn's argument, the jury reduced Wright's damage number by more than two-thirds. Given the conflicting evidence in the record, the Court stands by its decision to deny Pizza Inn's motion for judgment as a matter of law based on insufficient proof of reasonably certain lost profits.

Signed March 1, 2019.

David C. Godbey
United States District Judge